UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

DARREN CARTER,       )
        Plaintiff,   )
     v.        )    CASE NO. 1:15-cv-1228-RLY-DML
              )
PORTFOLIO RECOVERY   )
ASSOCIATES, LLC,      )
        Defendant  )
_____ )

### DEFENDANT'S CONSOLIDATED BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY

## I. INTRODUCTION

Portfolio Recovery Associates, LLC ("PRA"), a debt collector, has an agreement with TransUnion to furnish agreed upon information regarding individual debtors. PRA does not request specific information on a specific day. Rather, there are agreed upon "triggers" and when TransUnion monitors a change in one of the agreed upon data elements, it automatically reports that change to PRA. This data is not used by PRA's collection department, but rather, is analyzed by its strategy and analytics department to help determine overall collection strategy on accounts. PRA updates its list of active accounts with TransUnion on the 10th of every month. In 2013, PRA purchased a delinquent credit card debt owed by plaintiff Darren Carter, and included him on the list of active debtors for TransUnion to monitor.

Carter filed for bankruptcy protection in July of 2014, and PRA received

notice of that filing no later than July 21, 2014. PRA immediately updated his account to reflect the bankruptcy filing, which prevented its collection department from taking any action and effectively froze the account. In addition, PRA immediately flagged his account for removal from the list of accounts TransUnion monitors.

On August 7, 2014, only three days before Carter's name would be purged from the list of active accounts, TransUnion transmitted information to PRA regarding Carter's account. As Carter's account was in bankruptcy status, PRA did not do anything with the data received, and three days later on August 10, Carter's account was purged from the list of accounts TransUnion was monitoring.

Carter now contends PRA's passive receipt of information on August 7, 2010, amounted to a willful violation of the Fair Credit Reporting Act ("FCRA"), and furthermore violated the Fair Debt Collection Practices Act ("FDCPA"). Simply put, these claims fail for want of proof. Carter cannot show PRA willfully "used" or "obtained" a "consumer report" without a permissible purpose in violation of the FCRA. 15 U.S.C. §§ 1681b(f), 1681n. Nor can he establish PRA violated any provision of the FDCPA. See 15 U.S.C. § 1692 *et seq*. And while PRA maintains there was no violation of either the FCRA or the FDCPA, to the extent the Court finds PRA's passive receipt of information violated either statute, PRA submits Carter sustained no concrete injury as a result of PRA's actions and therefore lacks standing under Article III. For these alternative reasons, PRA is entitled to summary judgment as to all counts of Carter's complaints.

## II. STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Sometime prior to November of 2013, PRA purchased a Home Depot branded credit card debt owed by Carter. [Sundgaard Depo., pp. 7-8] On November 6, 2013, PRA sent its initial dunning letter to Carter on the credit card debt. [Sundgaard Depo., p. 9] Initial efforts to collect the account were unsuccessful, and on January 7, 2014, PRA sent a letter to Carter notifying him that it had transferred his account to its litigation department. [Sundgaard Depo., pp. 12-13] On June 26, 2014, PRA filed a lawsuit against Carter for the unpaid credit card debt. [Sundgaard Depo., p. 14]

Less than one month after the lawsuit was filed, on July 17, 2014, Carter filed for bankruptcy protection pursuant to Chapter 7 of the Bankruptcy Code. [Complaint, p. 2, ¶ 20] PRA received notice of the bankruptcy filing no later than July 21, 2014. [Complaint, p. 3, ¶ 24; Sundgaard Depo., p. 25]

When notified of a bankruptcy filing by an individual debtor, PRA changes the account status to bankruptcy status and transfers the account to its bankruptcy department. [Church Depo., pp. 9, 17] Bankruptcy status renders an account uncollectable, such that collectors are unable to take any action on the account. [Church Depo., p. 17; Sundgaard Depo., p. 26] PRA's system in effect "freezes" the account and prevents the account from entering the workflow of its collection department. [Sundgaard Depo., p. 27]

On July 21, 2014, PRA changed Carter's account status to bankruptcy, recalled Carter's account from its litigation department, and moved the account to

the bankruptcy department. [Sundgaard Depo., pp. 25-26]

Separate and distinct from its collection department, PRA maintains a strategy and analytics department. The strategy department purchases certain data from various vendors and uses that data to internally score individual accounts. [Anderson Aff., ¶¶ 4-5] These internal scores affect collection strategy; however, they do so at the system level. [Anderson Aff., ¶¶ 4-5] Individual collectors do not have access to the data used to internally score the accounts, all of which is stored in an offline database. [Anderson Depo., pp. 19-20, 22]

TransUnion is one among several data vendors PRA utilizes.[1] [Anderson Depo., pp. 10-12, 17-18] Pursuant to a Master Agreement, TransUnion monitors active PRA customers and delivers the specific data elements PRA requests. [Anderson Depo., pp. 18-19] PRA refers to this service as a "trigger." [Anderson Affidavit, ¶ 6] These triggers are not actively requested by PRA on a particular day; rather, they are automatically generated by a predetermined monitoring prompt. [Anderson Affidavit, ¶ 6] These data elements include matters such as applications for new credit, payments on a charged off account, or a change of address or phone number. [Anderson Depo., pp. 25, 33] In addition to these hard data elements, PRA purchases various predictive scores from TransUnion, and TransUnion notifies PRA when there is a material change in one of these predictive scores. [Anderson Depo.,

---

[1] TransUnion is a credit reporting agency, [Parties' Stipulated Facts, Doc. 34-5], and PRA additionally interacts with TransUnion as a data furnisher and reports the status of its accounts to TransUnion (along with the two other major credit reporting agencies). However, the nature of that relationship is not at issue in this litigation.

pp. 12-13, 25] This data does not include a debtor's FICO credit score. [Anderson Depo., p. 26] Thus, if TransUnion obtains updated location information, or receives information regarding a change in a consumer's recovery score or credit account limits, it automatically sends that information to PRA. [Anderson Affidavit, ¶ 6]

PRA maintains a list of active account holders/debtors with TransUnion. [Anderson Depo., p. 31] That list is updated once a month by removing customers who are no longer active and adding newly active consumers. [Anderson Depo., p. 31] Specifically, PRA prepares a list of those debtors it wishes to delete from monitoring and a separate list of those debtors it wishes to add to TransUnion's monitoring. [Anderson Depo., p. 43] That update occurs on the 10th of every month. [Anderson Depo., p. 31]

Limiting the frequency of the update to once a month was recommended to PRA by TransUnion. [Anderson Depo., pp. 32-33] PRA's Vice President of Operations Strategy summarized in his deposition:

> When our technical people and TransUnion's technical people got together to work on the technical details, they agreed that the best practice was once a month for simplicity and to keep—minimize the risk of our list of monitored customers and theirs becoming out of sync. Monthly was the agreed-upon best practice.

[Anderson Depo., p. 33]

When an account is moved to bankruptcy status, it is likewise flagged to be purged from the list of accounts monitored by TransUnion. [Anderson Aff., ¶ 8] The entire process is automated and occurs at the system level as soon as the account status is changed to bankruptcy. [Anderson Aff., ¶ 8] If data is transmitted from

TransUnion to PRA after an account has been moved to bankruptcy status, the data is not used for any purpose. [Anderson Depo., p. 38; Anderson Aff., ¶ 11]

Carter's account was removed from the TransUnion monitoring list on August 10, 2014, which was the first opportunity following notice of his bankruptcy. [Anderson Aff., ¶ 10] Between July 21, 2014, and August 10, 2014, TransUnion transmitted data to PRA on Carter's account.[2] [Anderson Depo., p. 36] Carter focuses upon a transfer occurring on August 7, 2014. [Complaint, p. 3, ¶ 26; Doc. 34, p. 2] As the account had already been moved to bankruptcy status, PRA did not use the data transmitted by TransUnion for any purpose after July 21, 2014.[3] [Anderson Depo., p. 38; Anderson Aff. ¶¶ 10-12]

### III.   MOTION TO STRIKE PORTIONS OF CARTER'S DESIGNATED EVIDENCE

Pursuant to Local Rule 56-1(i), PRA objects and moves to strike portions of

---

[2] Carter states repeatedly through his brief that PRA reviewed his "credit report." There is no evidence supporting this statement, and the undisputed facts show the exact opposite; PRA did not ever receive a complete credit report for Carter. [Anderson Depo., pp. 26-27] Rather, PRA received a data transmission from TransUnion on August 7, 2014. [See generally, Anderson Affidavit]

[3] Carter has offered via an exhibit to his own affidavit that his TransUnion credit report shows a PRA "account review inquiry" on August 7, 2014. As demonstrated in PRA's motion to strike, this is inadmissible hearsay. However, even if the exhibit were admissible, the information contained therein is entirely consistent with the above facts. An "account review inquiry" is known in the industry as a "soft pull" or "soft push." [Anderson Aff., ¶ 13] An account review inquiry is not visible to any creditor or third party and does not impact the consumer's FICO credit score. [Anderson Aff., ¶ 13] The inquiries are listed only on a report requested by the consumer. [Anderson Aff., ¶ 13] In this instance, the account review inquiry simply documents the August 7 transmission of data from TransUnion to PRA as no other actions were taken by PRA on that date with respect to Carter's TransUnion report. [Anderson Aff., ¶¶ 14-15]

Carter's affidavit and brief, specifically Exhibit B to his affidavit (purported to be portions of his TransUnion credit report) and all discussion on pages 16 to 20 of the brief that purports to "resolve" issues of fact. [Doc. 34; 34-3]

A. <u>Motion to Strike Exhibit B to Carter's Affidavit</u>

Carter's affidavit purports to attach as Exhibit B portions of his TransUnion credit report. However, Carter has made no attempt to authenticate the document, and more importantly, even if authentic, the exhibit is patently hearsay. The Court must strike Exhibit B to Carter's affidavit.

"To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Certain items of evidence are self-authenticating, "require[ing] no extrinsic evidence of authenticity in order to be admitted," Fed. R. Evid. 902, but a credit report does not fall under any of the exceptions provided by Rule 902. <u>See id.</u> Carter has made no attempt to authenticate the credit report, and for this reason alone, the Exhibit must be stricken.

But PRA's argument is more than a mere procedural objection, as even if properly authenticated, the portions of the report Carter tendered amount to inadmissible hearsay. Hearsay is an out-of-court statement "a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). "[H]earsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial." <u>Eisenstadt v. Centel Corp.</u>, 113 F.3d 738,

742 (7th Cir. 1997). Citing the unauthenticated, incomplete TransUnion credit report attached to his affidavit as Exhibit B, Carter contends PRA made an "account review inquiry" on August 7, 2014. [Doc. 34, p. 2] This exhibit compiles a series of out-of-court statements, is plainly offered for the truth of the matter asserted, and thus amounts to hearsay. Although a credit report could potentially qualify as a business record, Carter has made no attempt to lay the foundation for admissibility under Evidence Rule 803(6),[4] and he has failed to identify any other hearsay exception that may apply. Exhibit B is unauthenticated, inadmissible hearsay and should therefore be stricken. See Malec v. Sanford, 191 F.R.D. 581, 585 (N.D. Ill. 2000) (stating hearsay "does not constitute adequate evidentiary support for a factual proposition" in a motion for summary judgment).[5]

---

[4] In fact, the credit report would likely be considered a summary of TransUnion's business records, admissible under Evidence Rule 1006 only to the extent that the materials summarized are admissible. See United States v. Irvin, 682 F.3d 1254, 1262 (10th Cir. 2012) ("The materials summarized by Rule 1006 evidence must themselves be admissible because a contrary rule 'would inappropriately provide litigants with a means of avoiding rules governing the admission of evidence such as hearsay.' Accordingly, just as the proponent of hearsay evidence bears the burden of establishing the applicability of a hearsay exception, so too must the proponent of a Rule 1006 summary based on hearsay evidence establish that the materials summarized are admissible."). The credit report was purportedly issued on June 18, 2015, but summarizes account review inquiries dating back to June 27, 2013. Because the credit report was not created "at or near the time" of the events recorded therein, it does not fall within the purview of the business records exception. Fed. R. Evid. 803(6).

[5] Even if the Court denies PRA's motion to strike Exhibit B to Carter's affidavit, Exhibit B does not create a question of fact on Mark Anderson's testimony as to the nature of the data transmission on August 7, 2014. The portion of the credit report attached to the affidavit purportedly shows that PRA made an "account review inquiry" on August 7, 2014. This does not, as Carter states on page 6 of his brief, support the conclusion that PRA "procured Mr. Carter's TransUnion credit report on August 7, 2014." Rather, the only admissible testimony on this point shows that

B. <u>Motion to Strike "Resolution" of Material Facts in Dispute</u>

Rule 56 provides summary judgment is proper if "the movant shows that there is *no genuine dispute as to any material fact* and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphasis added). Yet, Carter on pages 16 to 20 of his brief contends material facts are in dispute and further purports to "resolve" these disputes.  PRA objects and moves to strike the entirety of the section titled "Resolution of the Statement of Material Facts in Dispute" because "[i]ssues of material fact cannot be resolved on summary judgment."[6] <u>Hasan v.</u>

---

an "account review inquiry" is merely a log of the passive transmission of data by TransUnion to PRA. Anderson testified,

> And as I said, TransUnion's monitoring our active customers, and as they see events transpire, they will communicate those events to us. Every time they do, that's logged as a soft pull, but the frequency is based on the events that they see happening on the consumer's file.

[Anderson Depo., pp. 24-25]

Moreover, if PRA had accessed or procured the complete credit report, such activity would appear in the collection logs on Carter's account. [Anderson Aff., ¶ 15] Those logs are silent and reinforce Anderson's uncontroverted testimony that PRA did not access or procure the complete credit report on August 7, 2014, or at any other time after it received notice of Carter's bankruptcy. [Anderson Aff., ¶ 15]

[6] In his attempt to "resolve" what he considers to be a factual dispute in this matter, Carter on pages 19 to 20 of his brief contends PRA's counsel took inconsistent positions in the deposition of Mark Anderson, and inferentially, that this supports his contention that PRA *accessed* Carter's complete credit report. First, PRA would note Carter asked the witness "when PRA *accessed* his credit report," [Anderson Depo., p. 32 (emphasis added)], after the witness had already corrected Carter by stating "'pulls' is probably not the right word" with respect to the services TransUnion provides, and that "push" would be more appropriate, [Anderson Depo., p. 24].  Second, the line of questioning in which PRA's counsel mentioned account representatives "accessing" credit reports was a hypothetical line of questioning to reinforce that an access did not occur in this case, because *IF* it had, there would be

9

Foley & Lardner LLP, 552 F.3d 520, 530 (7th Cir. 2008).

## IV. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant's burden may be discharged by demonstrating an absence of evidence to support an essential element of the nonmovant's case. Green v. Whiteco Indus., Inc., 17 F.3d 199, 201 (7th Cir. 1994) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). Once the movant establishes there is a lack of evidence on a necessary element, the nonmovant has the burden to come forward with specific admissible facts that demonstrate an issue for trial. Id. at 202. Only factual disputes that may affect the outcome of the suit under the governing law will properly preclude entry of summary judgment. Radke v. Taco Bell Corp., 64 Fed. App'x 542, 544 (7th Cir. 2003) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). Disputes over irrelevant or unnecessary facts are immaterial. *Id.*

## V. ANALYSIS

A. PRA Is Entitled to Summary Judgment on Carter's FCRA Claim Because Carter Cannot Show PRA Willfully Used or Obtained a Consumer Report Without a Permissible Purpose

The FCRA prohibits any person from using or obtaining a consumer report for any purpose other than those expressly permitted by 15 U.S.C. § 1681b.[7] To

_____

a log of that in the account notes. [Anderson Depo. pp. 44-45]

[7] "Person" is broadly defined as "any individual, partnership, corporation, trust,

establish a claim for improper use or acquisition of a consumer report, a plaintiff must show: (1) the defendant used or obtained; (2) without a permissible statutory purpose; (3) a consumer report; and (4) that defendant was negligent or willful in doing so. DeMaestri v. VeriFacts, Inc., No. 11-cv-02430-WYD-KMT, 2012 U.S. Dist. LEXIS 49861, at *12-13 (D. Colo. Mar. 16, 2012) (citing Phillips v. Grendahl, 312 F.3d 357, 367 (8th Cir. 2002) abrogated on other grounds by Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47 (2007)), adopted, 2012 U.S. Dist. LEXIS 49858 (D. Colo. Apr. 10, 2012). Carter cannot show the requisite elements for a willful violation.

### 1. Carter Cannot Show PRA "Used" or "Obtained" the Data Transmitted by TransUnion on August 7, 2014

First, PRA did not "use" or "obtain" the August 7 transmission. See 15 U.S.C. § 1681b(f). There can be no legitimate argument as to "use" because PRA's witnesses conclusively establish PRA did nothing with the data it received from TransUnion after notice of Carter's bankruptcy. [Anderson Depo., p. 38; Anderson Aff. ¶ 12] Carter states on page 21 of his brief, in apparent support of this element of the claim, that PRA "obtains information and employs it for debt collection purposes." [Doc. 34, p. 21] Although PRA certainly uses the data it receives from TransUnion regarding *active* customers whose accounts may still be collected [Anderson Depo., pp. 22, 24-25, 33], Carter has omitted the fact that PRA changes an account's status to an uncollectable bankruptcy status once it receives notice of a bankruptcy filing, that bankruptcy status effectively "freezes" an account, and that

estate, cooperative, association, government or governmental subdivision or agency, or other entity." 15 U.S.C. § 1681a(b).

PRA had already updated Carter's account to bankruptcy status when it received data from TransUnion on August 7. [Sundgaard Depo., pp. 25-27; Church Depo., pp. 9, 17, Anderson Affidavit, ¶¶ 11-12] Therefore, PRA did not "use" the data it received. [Sundgaard Depo., pp. 25-27; Church Depo., pp. 9, 17]

Thus, the existence of this element of the claim hinges solely upon the inclusion of the word "obtain" in the statute, and specifically whether PRA "obtained" a consumer report through its passive receipt of information from TransUnion on August 7. Merriam-Webster defines "obtain" as "to gain or attain usually by planned action or effort." Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/obtain (last visited Aug. 30, 2016). Similarly, Black's defines "obtain" with reference to affirmative conduct, as "[t]o bring into one's own possession; to procure, esp. through effort." Black's Law Dictionary 1078 (10th ed. 2014).

PRA submits that it can only "obtain" a consumer report for purposes of Section 1681b(f) through *affirmative* conduct. The Eighth Circuit supports this view as it has noted "[m]ere passive receipt" of a consumer report is insufficient to meet the statutory requirement of "obtaining." Phillips v. Grendahl, 312 F.3d 357, 367 (8th Cir. 2002) abrogated on other grounds by Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47 (2007). This finding has been endorsed by several lower courts. See, e.g., In re Croft, 500 B.R. 823, 845 (Bankr. W.D. Tex. 2013) ("[M]ere passive receipt of a consumer report is insufficient to establish liability under the FCRA."); Geiling v. Wirt Fin. Servs., Inc., No. 14-cv-11027, 2015 U.S. Dist. LEXIS 40957, at *22 n.5

(E.D. Mich. Mar. 31, 2015) ("Of course, it would be illogical to impose liability on persons who come into possession of improperly furnished consumer credit reports merely by happenstance.") Admittedly, these decisions are not squarely on point with the present situation; however, they are all predicated upon the same statutory reading offered by PRA, namely that the verb "obtain" necessarily has an active component.

PRA submits that its passive receipt of the August 7 transmission does not meet the statutory requirement of "obtaining" a consumer report. PRA further notes that such a finding would not create a loophole to liability, as a person who *uses* a consumer report impermissibly is still liable regardless of how it was obtained. See Raymond v. Raymond, No. 03-C-9150, 2005 U.S. Dist. LEXIS 42797, at *9 (N.D. Ill. Oct. 7, 2005) ("Section 1681b(f) uses 'obtain' and 'use' in the disjunctive, thus [plaintiff] must only prove one of these actions to hold defendants liable."). This argument applies to the extremely narrow situation presented here: the defendant receives data without making an affirmative request and does not use that data for any purpose.[8] Under these circumstances, PRA has not "used" or "obtained" a consumer report, and there is no violation of Section 1681b(f).

## 2. Even if PRA "Used" or "Obtained" the Data Transmitted by TransUnion, PRA Had a Permissible Purpose

Second, even if the Court determines PRA "used" or "obtained" the data

---

[8] This argument foreshadows the discussion that follows regarding whether the Supreme Court's recent decision in Spokeo, Inc. v. Robins, 136 S. Ct. 1540 (2016), deprives Carter of standing to bring this suit, as it seems inconceivable that Carter has sustained any concrete harm as a result of the circumstances of this case.

transmitted on August 7, PRA had a permissible purpose for its actions. See 15 U.S.C. § 1681b(f)(1). There can be no reasonable dispute that a debt collector may permissibly receive consumer reports on active accounts, see Miller v. Wolpoff & Abramson, LLP, 309 F. App'x 40, 43 (7th Cir. 2009), and Carter has not so argued. Rather, he argues that because the case was subject to a bankruptcy stay at the time PRA received the August 7 transmission, the permissible purpose had evaporated. The law does not support this position.

Section 1681b(a)(3)(A) of the FCRA provides that delivery of a consumer report is permissible where the receiving party "intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer." The operative word in the statute is intends. See Trikas v. Univeral Card Services Corp., 351 F. Supp. 2d 37, 42 (E.D.N.Y. 2005) ("Plaintiff's argument overlooks the plain language of [Section 1681b], which focuses on the intent of the party obtaining the consumer report.") (emphasis in original). There can be no reasonable dispute that PRA's intent in receiving data transmissions from TransUnion relates to its collection of its active accounts, and thus PRA had a permissible purpose.

This point is best demonstrated by the Trikas decision, as well as Riddle v. Portfolio Recovery Associated, Inc., No. 12-92-DLB-JGW, 2014 U.S. Dist. LEXIS 40034 (E.D. Ky. Mar. 26, 2014). In Trikas, a bank failed to properly code an account as closed, and thus continued to receive consumer reports from TransUnion. 351 F.

Supp. 2d at 42. The district court recognized there was an error on the part of the bank; however, it noted the error did not obviate the bank's permissible purpose under Section 1681b(a)(3)(A), explaining,

> The Bank did not plot or plan to obtain Plaintiff's credit report for any ostensibly impermissible purpose; it was simply retained in error. Any inquiries into Plaintiff's consumer report occurred under the Bank's intent to review an existing customer's account, even though Plaintiff was no longer the Bank's customer.

Id. at 43.

The Riddle decision is even more instructive as the district court applied these principals to the PRA/TransUnion relationship at issue here. 2014 U.S. Dist. LEXIS 40034, at *14-16. In Riddle, the debtor allegedly defaulted on two utility debts, which were subsequently purchased by PRA in 2004. Id. at *1. PRA made three unsuccessful attempts to contact the debtor, and then made no further attempts after September of 2004. Id. at *3. However, PRA continued to receive information about the debtor from TransUnion. Id. The facts demonstrated that on either four or eight separate occasions between July 24, 2010, and March 1, 2011, TransUnion transmitted information to PRA about debtor Riddle. Id. at *3-4.[9] The March 1 transmission was particularly critical as just two weeks prior, the debtor had notified PRA that he disputed the debt, purportedly eliminating the permissible purpose justifying the transmission of data on March 1. Id. at *4. Riddle argued that after he disputed the debt, PRA had no permissible purpose to passively

---

[9] PRA notes the Riddle decision involves the exact same Master Agreement with TransUnion at issue here, as the program commenced in 2010. [Anderson Depo., p. 17]

receive the March 1 transmission from TransUnion. Id. at *14. The Court rejected this argument, explaining,

> The Court finds Trikas applicable to this case *sub judice*. Although the exact time line is not clear, the Court assumes that Plaintiff's accounts had been purged prior to his consumer report being accessed on March 1, 2011. Like the court held in Trikas, "the intention behind [PRA, LLC's] periodic request for Plaintiff's consumer report was merely to review his account, albeit an account that [was] closed." That is permitted by 15 U.S.C. § 1681b(a)(3)(A). Thus, the March 1, 2011 review did not violate the FCRA.

Id. at *16 (alteration in original) (citation omitted).

Carter directs this Court to Buckley v. AFNI, Inc., 133 F. Supp. 3d 1140 (S.D. Ind. 2016), and Goodby v. Wells Fargo Bank, N.A., 599 F. Supp. 2d 934 (S.D. Ohio 2008). Both decisions are easily distinguishable as they both involve *affirmative* actions to procure a consumer report *months* after a bankruptcy discharge extinguished the debt at issue.

In Buckley, the debt collector obtained the debtor's credit report approximately five months after her account had been discharged in bankruptcy. 133 F. Supp. 3d at 1145-46. Five months later, or ten months after her account had been discharged, the debtor received a collection letter seeking to collect the discharged debt. Id. at 1146. Finding the debt collector received notice of the bankruptcy discharge and that its attempt to collect the discharged debt resulted from an internal failure to properly close the debtor's account, the district court concluded the debtor established a FCRA violation. Id. at 1147.

Likewise, in Goodby, Wells Fargo held a mortgage on the debtor's property when the debtor filed for bankruptcy. 599 F. Supp. 2d at 935-36. The mortgage

account was subsequently discharged, and Wells Fargo received notice of that discharge. Id. Yet, more than nineteen months later, as a part of an account review for the property, the bank requested and received the debtor's FICO credit score. Id. at 936. Finding Wells Fargo did not have a legitimate business need for the debtor's credit score once the mortgage was discharged, the district court concluded Wells Fargo violated the FCRA when it requested the debtor's credit score. Id. at 942.

Both cases are easily distinguishable. First, both Buckley and Goodby concern post-discharge violations. As Carter rightfully acknowledges, there is a difference between a bankruptcy discharge and the automatic stay. [Doc. 34, p. 23] But contrary to Carter's assertion, the difference is not "immaterial." [Doc. 34, p. 23] Indeed, the difference is rather fundamental. A discharge is permanent; the automatic stay is not. See, e.g., In re Henry, 266 B.R. 457, 473 (Bankr. C.D. Cal. 2001). Buckley and Godby are grounded in the fact that the debt was permanently uncollectable—a fact not present in this case. The August 7 transmission occurred well before a discharge would be granted or denied. Moreover, neither Buckley nor Godby involved a passive receipt of information. Unlike PRA, the defendant in each case affirmatively sought the consumer report at issue. Finally, both Buckley and Goodby involved a significant lapse in time simply not present on this record. In Buckley, the debt collector requested the credit report approximately *five months* after the debtor's account had been discharged. 133 F. Supp. 3d at 1145-46. Similarly, the request in Goodby occurred over *nineteen months* after discharge. 599 F. Supp. 2d at 935-36. By contrast, the transmission in the present case occurred

less than *three weeks* after PRA received notice of Carter's bankruptcy petition and only a *few days* before Carter's name was scheduled to be removed from the list of customers to be monitored by TransUnion. [Complaint, p. 3, ¶¶ 24, 26; Sundgaard Depo., p. 25; Anderson Aff., ¶ 10]

The facts of this case fit squarely within the holdings of <u>Trikas</u> and <u>Riddle</u> and demonstrate that PRA had a permissible purpose for its receipt of the August 7 transmission from TransUnion. [10]

---

[10] PRA further notes a logical hole in Carter's argument on permissible purpose that cannot be ignored. Carter argues PRA did not have permissible purpose when it received the data transmission from TransUnion. [Doc. 34, p. 16] By implication, Carter argues date of receipt—rather than date of request—is determinative. Although PRA maintains it had a permissible purpose on August 7, it alternatively proposes the August 7 date is irrelevant because the applicable date for resolution of the question is July 10.

As noted previously, on the 10th of every month, PRA updates its list of active accounts with TransUnion by adding and deleting individuals as necessary. [Anderson Depo., p. 31] There is no dispute that on July 10, 2014—the last date PRA could be said to have taken any affirmative steps towards obtaining consumer reports as to Carter—PRA had a permissible purpose for the request. The account was active, and the bankruptcy petition was not filed until the following week. The fact that PRA received something after July 17 does not eliminate the permissible purpose present on July 10 when the information was implicitly requested.

By analogy, suppose a debt collector were to request information from a consumer reporting bureau by U.S. Mail. And further suppose that after that valid request was made, but before the response was received, the consumer filed for bankruptcy. Certainly, the debt collector would not violate the FCRA merely because the U.S. Postal Service does not instantaneously deliver information.

It would be a different case if PRA failed to update its list on August 10 to remove Carter from the TransUnion reporting system, as potentially that would be an affirmative action taken without a permissible purpose. <u>But see</u> <u>Trikas</u>, 351 F. Supp. 2d at 42-43. But that is not this case. PRA took no affirmative action after receipt of the bankruptcy notice, and all affirmative actions were undertaken in accordance with an expressly permitted purpose. <u>See</u> <u>Miller</u>, 309 F. App'x at 43

### 3. Carter Cannot Show the Data Transmitted on August 7, 2014, Meets the Statutory Definition of a "Consumer Report"

Third, Carter cannot show the August 7 transmission constitutes a "consumer report" subject to the FCRA. See 15 U.S.C. § 1681a(d). Carter alleges in his complaint that PRA accessed his "credit report" on August 7, 2014, [Complaint, p. 3, ¶ 24], but this allegation disregards the uncontroverted testimony of PRA's witnesses. The undisputed, admissible evidence in the record shows PRA did not access Carter's complete credit report, and only passively received certain unknown data regarding Carter's account between the notice of bankruptcy on July 21 and the scheduled removal date of August 10. [Anderson Depo., pp. 27, 30-31, 36; Anderson Aff. ¶ 15]

Carter focuses upon a single transmission of data, occurring on August 7, 2014. However, he cannot demonstrate the data transmitted on August 7 was a "consumer report" within the meaning of the statute.[11] Carter directed no discovery requests to TransUnion to investigate *what* it transmitted on August 7, and remarkably, did not ask any of PRA's witnesses *what* data PRA received on August 7. Accordingly, Carter has wholly failed to carry his burden to establish the August 7 transmission contained information that places it within this definition of a

---

(citing 15 U.S.C. § 1681b(a)(3)(A)).

[11] The FCRA defines "consumer report" as a communication from a consumer reporting agency "bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for" credit, insurance, employment, or any other permissible purpose. 15 U.S.C. § 1681a(d).

"consumer report." Carter has an affirmative obligation to establish each prima facie element of his claim. See Celotex, 477 U.S. at 322 (stating Rule 56 mandates entry of summary judgment against a party who fails to make a showing sufficient to establish an essential element of claim for which the party will bear the burden of proof at trial). While not a particularly demanding requirement, see TransUnion Corp. v. F.T.C., 81 F.3d 228, 231 (D.C. Cir. 1996), Carter still must show that the August 7 communication from TransUnion contained information bearing on his credit worthiness, credit capacity, character, general reputation, personal characteristics, or mode of living in order to subject the transmission to the FCRA.[12] In light of this foundational omission, Carter's FCRA claim collapses.

### 4. Carter Cannot Show PRA Acted Willfully

Finally, Carter has advanced no evidence demonstrating PRA willfully failed to comply with any provision of the FCRA. See 15 U.S.C. § 1681n (authorizing actual, statutory, and punitive damages for willful noncompliance). The United States Supreme Court in Safeco Ins. Co. v. Burr, 551 U.S. 47, 69 (2007), held willful

---

[12] On page 21 of his brief, Carter cites to lines 10-14 of page 36 of the Anderson deposition for the proposition that "Defendant received information pertaining to Mr. Carter's credit report." [Doc. 34, p. 21] The actual testimony cited stated the following:

> Q        Okay. Information you said that—let's go back. Mr. Carter's credit report, as you put it, was sent by TransUnion on August 7th, right?
> A        They sent us an update. It was not a complete credit report.

Carter has offered no evidence, and in fact has none, showing the contents of this "update." Thus, he cannot show that the information transmitted on August 7 fits within the statutory definition of a "consumer report."

noncompliance includes acts committed in reckless disregard of the FCRA's requirements.[13] Carter argues PRA's conduct was not just willful but intentional. [Doc. 34, p. 22] However, the undisputed facts do not support this statement. PRA did not carry out an intentional act after receiving notice of the bankruptcy filing; it only passively received data from TransUnion (and of course, did nothing with it). Nor did PRA act in reckless disregard of Section 1681b. As soon as PRA received notice of Carter's bankruptcy petition, it updated his account to bankruptcy status, ceased all collection activity, and flagged his account for removal from the list of accounts TransUnion monitors. See Trikas, 351 F. Supp. 2d at 45 (stating the sole fact that the bank "did not move quickly enough" is "insufficient for surviving summary judgment as to willfulness" on a FCRA claim). The steps PRA took after receiving notice of Carter's bankruptcy demonstrate PRA's good faith and willingness to comply.

For the reasons discussed above, PRA maintains it did not violate Section 1681b with respect Carter's account, but if the Court determines PRA's passive receipt of data did violate the FCRA, Carter cannot demonstrate PRA acted in reckless disregard of the statute's requirements (and thus cannot recover statutory

---

[13] Although the Supreme Court specifically addressed what constitutes willful noncompliance of the FCRA in Safeco, Carter cites on page 22 of his brief In re Torres, 544 B.R. 741, 749 (Bankr. D.P.R. 2015), which defines "willful" violations of the automatic stay as "intentional" conduct by a creditor. Unlike the standard enunciated by the First Circuit in the context of bankruptcy, the standard announced in Safeco extends to "reckless" conduct as well.

or punitive damages).[14]

B. Carter's FDCPA Claims Fail Because PRA Did Not Violate Any of the FDCPA's Provisions

### 1. PRA Did Not Engage in Harassment, False or Misleading Representations, or Any Unfair Means of Collection

The undisputed facts similarly negate the purported FDCPA claim, and PRA is entitled to summary judgment on this count as well. In his complaint, Carter states PRA violated three distinct sections of the FDCPA: 15 U.S.C. § 1692d (prohibiting harassment), 15 U.S.C. § 1692e (prohibiting false or misleading representations), and 15 U.S.C. § 1692f (prohibiting unfair or unconscionable means of collection). [Complaint, pp. 4-5] Factually, all three claims are predicated upon the August 7 transmission of data, asserting that it constitutes an attempt to collect a debt that PRA was legally enjoined from collecting.

Typically, whether conduct by a debt collector constitutes "collection activity" is only relevant where a debtor requests validation or verification of the debt within thirty days of the initial communication from the debt collector. Section 1692g(b) of the FDCPA provides that a debt collector must "cease collection of the debt, or any disputed portion thereof" if a consumer exercises her statutory right to dispute the

---

[14] Carter has not argued in favor of application of the negligence standard to his FCRA claim, and even if he had, such a claim fails as he cannot present evidence of actual damage sufficient to survive summary judgment. See 15 U.S.C. § 1681o (authorizing actual damages for negligent noncompliance). Although the August 7 transmission is documented as an "account review inquiry" on any credit report Carter himself requests, the notation is not visible to creditors or third parties and had no effect on Carter's credit score. [Anderson Aff. ¶ 13]; see also Trikas, 351 F. Supp. 2d at 45 (concluding plaintiff failed to prove actual damages under the FCRA because "the inquiries on his consumer report would only be viewed by him, would not be visible to creditors, and would not affect any credit decisions").

debt or request validation. Carter did not request validation or dispute the debt, and he has not brought any claims under Section 1692g. Thus, whether PRA's passive receipt of the data transmission on August 7 constitutes "collection activity" is irrelevant.

Rather, the simple question is whether the conduct at issue violates the sections under which Carter has plead his claims. The undisputed facts show that after July 21, 2014, PRA did not communicate in any manner with Carter. It seems axiomatic that in order to harass a person pursuant to Section 1692d, there must be conduct directed to that person. Even if this were not the case, subsection (3) makes clear that communications with a consumer reporting agency are *not* harassing, noting that a publication of a list of debtors is prohibited, except when provided to a consumer reporting agency. If the reporting of information to TransUnion would not be harassing as a matter of law, certainly the passive receipt of data is not harassing.

Section 1692e is equally unavailing for Carter. That section prohibits a debt collector from using any false or misleading representation or means in connection with collection of a debt. As the undisputed facts make clear PRA did not communicate with Carter (or with anyone else) after July 21, 2014. There can be no false or misleading statement or means of collection.

Finally, Section 1692f prohibits a debt collector from using an unfair or unconscionable means to collect a debt, and courts have noted this section often acts as a "catch-all" for conduct by a debt collector not otherwise actionable. See Okyere

v. Palisades Collection, LLC, 961 F. Supp. 2d 522, 529 (S.D.N.Y. 2013) (quoting Osborn v. Ekpsz, LLC, 821 F. Supp. 2d 859, 878 (S.D. Tex. 2011)) ("Section 1692f as a whole 'serves a backstop function, catching those unfair practices which somehow manage to slip by §§ 1692d & 1692e.'"). It strains credibility to argue that passively receiving communication from a consumer reporting agency is "unfair" or "unconscionable." See Randolph v. IMBS, Inc., 368 F.3d 726, 733 (7th Cir. 2004).

Accordingly, PRA is entitled to summary judgment on the Section 1692d, 1692e, and 1692f claims Carter asserts in the complaint.

## 2. While PRA Did Not Violate the Automatic Stay, a Violation of an Automatic Stay Is Not Necessarily a FDCPA Violation

In his brief in support of summary judgment, Carter does not specifically argue that any of these sections were violated; rather, he posits that PRA violated the automatic stay triggered by his bankruptcy filing and that a violation of the stay is necessarily a violation of the FDCPA. He writes on page 14 of his brief, without citation to any source of positive law, that PRA's actions constitute "a violation of the automatic stay which, in turn, triggers a violation of the FDCPA." [Doc. 34, p. 14] Both pillars of this argument fail upon scrutiny.

First and simplest, receipt of the August 7 transmission was not a violation of the automatic stay. There is a split in authority as to whether active credit reporting is prohibited by the automatic stay or the discharge injunction. Compare In re Sommersdorf, 139 B.R. 700, 702 (Bankr. S.D. Ohio 1992) (automatic stay prohibits active credit reporting), with In re Mahoney, 368 B.R. 579, 589 (Bankr. W.D. Tex. 2007) (credit reporting not prohibited by discharge injunction). However,

those cases deal active credit reporting and not, as is present here, a mere receipt of information from the credit reporting agency. PRA's research has failed to uncover a single case holding receipt of a consumer report is prohibited by the automatic stay. And Carter has certainly not directed the Court to any such authority. Simply put, there was no violation of the automatic stay.

Second and more fundamentally, the FDCPA does not convert every violation of the automatic stay into an actionable federal claim. This is the clear lesson of the Seventh Circuit's decision in <u>Randolph</u>. There, in a consolidated appeal, the Seventh Circuit analyzed several district court rulings addressing whether the Bankruptcy Code implicitly repeals portions of the FDCPA to the extent the statutory schemes apply different rules. 368 F.3d at 728-31. The lower courts had ruled that because Section 362 of the Bankruptcy Code requires willful action by the debt collector and the Bankruptcy Code occupies the field on the applicable standard of liability, the Bankruptcy Code barred Section 1692e claims based on its strict liability standard. <u>Id</u>. at 729. The Seventh Circuit rejected this finding, recognizing the FDCPA and Bankruptcy Code "are simply different rules, with different requirements of proof and different remedies." <u>Id</u>. at 732. Accordingly, a debt collector can still violate the FDCPA even if the conduct was not sufficiently willful to violate the automatic stay. <u>See id.</u> at 732-33. The flip side of this coin is that a violation of the automatic stay is not necessarily a violation of the FDCPA. They are separate rules, and compliance must be evaluated independently.

As noted previously, Carter cannot show PRA engaged in harassment,

misleading representations, or unfair means of collection in violation of the FDCPA provisions plead in the complaint. Whether PRA violated the automatic stay is irrelevant and does not provide an additional avenue of recovery for Carter. In short, there is no merit to the claim that PRA violated the FDCPA, and summary judgment is appropriate.

C. Carter Lacks Standing to Maintain this Suit Because He Did Not Sustain Concrete Injury as a Result of PRA's Actions

Although PRA maintains there was no violation of either the FCRA or the FDCPA, to the extent the Court finds PRA's passive receipt of information violated either statute, PRA submits Carter lacks Article III standing because he suffered no concrete injury as a result of violations that were procedural technicalities at most. To establish Article III standing, a plaintiff must demonstrate he suffered an "injury in fact," which is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). An "injury in fact" sufficient to confer standing is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." Id. (internal quotation marks omitted). Although Congress may "elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law," id. at 578, "the requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute," Summers v. Earth Island Inst., 555 U.S. 488, 497 (2009). "Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." Raines v. Byrd, 521 U.S. 811, 820 n.3 (1997).

Recently, the United States Supreme Court in <u>Spokeo, Inc. v. Robins</u>, 136 S. Ct. 1540 (2016), reiterated the requirement of an "injury in fact" in the context of an action brought under the FCRA. In <u>Spokeo</u>, a consumer filed a class-action complaint alleging Spokeo violated the FCRA by publishing on its website inaccurate information about the consumer's familial status, age, wealth, employment, and educational attainment. <u>Id.</u> at 1546. The district court dismissed the complaint on standing grounds, but the Ninth Circuit reversed, concluding Robins satisfied the injury-in-fact requirement because the complaint alleged "Spokeo violated *his* statutory rights, not just the statutory rights of other people," and because his "personal interests in the handling of his credit information are individualized rather than collective." <u>Id.</u> (emphasis in original) (quoting <u>Robins v. Spokeo, Inc.</u>, 742 F.3d 409, 413 (9th Cir. 2014)). Concluding the Ninth Circuit's analysis conflated the requirements of particularity and concreteness, the Supreme Court vacated the decision and remanded the case for the Ninth Circuit to address whether the particular FCRA violations alleged in the case "entail a degree of risk sufficient to meet the concreteness requirement." <u>Id.</u> at 1550.

As the Supreme Court explained, the FCRA requires consumer reporting agencies to "follow reasonable procedures to assure maximum possible accuracy" of consumer reports, <u>id.</u> at 1545 (quoting 15 U.S.C. § 1681e(b)), and authorizes actual, statutory, or even punitive damages for willful noncompliance. <u>Id.</u> (citing 15 U.S.C. § 1681n(a)). But the fact that a statute grants a statutory right and purports to authorize lawsuits to vindicate that right does not mean the injury-in-fact

requirement is satisfied.  Id. at 1549.  A "bare procedural violation, divorced from any concrete harm" is insufficient for Article III standing, the Court explained.  Id. With respect to Robins, the Court expressed no opinion on the ultimate resolution of the standing issue, but the Court made clear "[a] violation of one of the FCRA's procedural requirements may result in no harm." Id. at 1550.

A "concrete" injury is "real," not "abstract," and "actually exist[s]."  Id. at 1548.  Even assuming PRA violated the FDCPA and FCRA, the violations were at most "bare procedural violations, divorced from any concrete harm." Id. at 1549. PRA did not receive Carter's complete credit report on August 7 [Anderson Depo., pp. 26-27, 36] and did nothing with whatever data *was* transmitted because Carter's account was in bankruptcy status by that time [Sundgaard Depo., pp. 25-26; Anderson Aff. ¶¶ 11, 12]. Collection activity ceased as soon as PRA received notice of Carter's bankruptcy petition on July 21. Compare Mogg v. Jacobs, No. 15-cv-1142-JPG-DGW, 2016 U.S. Dist. LEXIS 110057, at *10-11 (S.D. Ill. Aug. 18, 2016) (citing Spokeo, 136 S. Ct. 1540) (holding debtor sustained concrete injury resulting from alleged violations of the FDCPA where debt collector filed suit against debtor after debtor filed for bankruptcy). Although the August 7 transmission is documented as an "account review inquiry" on any credit report Carter himself requests, the notation is not visible to creditors or third parties and had no effect on Carter's credit score. [Anderson Aff. ¶ 13] For these reasons, Carter lacks a concrete injury and therefore lacks Article III standing to maintain this suit.

## VI. CONCLUSION

For the foregoing reasons, PRA is entitled to summary judgment as to all counts of Carter's Complaint. PRA requests that the Court DENY Carter's Motion for Summary Judgment and GRANT PRA's motion for summary judgment in its entirety.

KIGHTLINGER & GRAY, LLP


By    s/ Nicholas W. Levi
      Nicholas W. Levi
      Attorney I.D. No.: 24278-53


## CERTIFICATE OF SERVICE

I hereby certify that on August 17, 2016, a copy of the foregoing pleading was filed electronically.  Service of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

John Steinkamp
John Steinkamp & Associates
5218 South East Street, Suite E1
Indianapolis, IN  46227
Email:  steinkamplaw@yahoo.com


s/  Nicholas W. Levi
Nicholas W. Levi

KIGHTLINGER & GRAY, LLP
One Indiana Square, Suite 300
211 North Pennsylvania Street
Indianapolis, Indiana  46204
Telephone:  317-638-4521